**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MARK PHELPS, Derivatively On Behalf Of PEABODY ENERGY CORPORATION, | Case No: |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| SAMANTHA B. ALGAZE, ANDREA E. BERTONE, NICHOLAS J. CHIREKOS, STEPHEN E. GORMAN, GLENN L. KELLOW, JOE W. LAYMON, BOB MALONE, DAVID J. MILLER, MICHAEL W. SUTHERLIN, DARREN R. YEATES, AND AMY B. SCHWETZ, | |
| Defendants, | |
| and | |
| PEABODY ENERGY CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Mark Phelps ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' (defined below) public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Peabody Energy Corporation ("Peabody" or the "Company"), legal filings, news reports, securities analysts' reports and

advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## I.   NATURE OF ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and/or officers from April 3, 2017 through the present (the "Relevant Period").

2.     Peabody purports to be the largest coal mining company in the world, with 23 coal mines throughout the United States and Australia.  One of its mines in Australia is the North Goonyella mine, which was acquired by Peabody in 2004 and through which the Company ships coal to customers in India, China and South Korea.  As of the start of the Relevant Period, the North Goonyella mine was considered Peabody's most profitable single operation.

3.     On April 3, 2017, the Company emerged from bankruptcy protection and reported record production output, while simultaneously touting its "record safety" achievements and its "ongoing commitment to ensuring safe, productive operations."

4.     However, unknown to the market at this time, was that the Company failed to disclose, and would continue to omit, the following adverse facts pertaining to the safety practices at the North Goonyella mine:

(a)     The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

(b)     The Company failed to follow its own safety procedures; and

(c)     As a result, the North Goonyella mine was at a heightened risk of shutdown.

5.     The truth about the inadequate safety practices was revealed when, on September

28, 2018, a fire erupted at the mine, forcing the Company to suspend operations indefinitely.  On this news, the Company shares fell $5.54 per share, or 13.4 percent.

6.      Following the fire, the Company assured the market that it had a feasible plan to remediate and reopen the North Goonyella mine, and that it would be able to extract significant coal at the mine in the near-term.  However, Defendants failed to disclose, and would continue to omit, the following adverse facts pertaining to the feasibility of the Company's plan to restart the North Goonyella mine:

(a)      The Company's low-cost plan to restart operations at the mine posed unreasonable safety and environmental risks;

(b)      The Australian body responsible for ensuring acceptable health and safety standards, the Queensland Mines Inspectorate ("QMI"), would likely mandate a safer, cost-prohibitive approach; and

(c)      As a result, there would be major delays in reopening the North Goonyella mine and restarting coal production.

7.      The truth about the feasibility of the Company's plan to restart operations at North Goonyella was revealed through a series of disclosures.

8.      On February 6, 2019, the Company revealed that contrary to previous statements, production at the North Goonyella mine would not resume in 2019 but was instead now targeted to begin to ramp in the early months of 2020.  On this news, the Company shares fell by $3.80 per share, or 10.6%.

9.      On May 1, 2019, the Company reported that it had received a directive from QMI which could lead to further delays and necessitate a re-evaluation of the Company's reentry plan. On this news, the Company shares fell $1.61 per share, or 5.6%.

10.     On July 31, 2019, the Company reported additional delays to the reentry of North Goonyella, explaining that QMI's requirements had resulted in a slower rate of progress than the initial plan had contemplated.  As a result, the Company suspended its 2020 production guidance at the mine and informed the market that it was reevaluating its entire reentry plan.  On this news, the Company shares fell by $1.06 per share, or 4.8%.

11.     On August 9, 2019, QMI released a one-page document with its preliminary investigative findings indicating that the Company had deficient safety systems at North Goonyella and that the Company was not cooperating fully with its investigation.  On this news, the Company's stock fell $0.37 per share, or 2 percent.

12.     Finally, on October 29, 2019, the Company disclosed that QMI was placing strict restrictions on restarting operations at the North Goonyella mine and that as a result the Company was forced to drastically adjust the reentry plan, ultimately announcing a three year or more delay before any meaningful coal could be produced.  On this news, the Company shares declined $3.56 per share, or 22 percent.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims based on violations of the Securities Exchange Act of 1934 (the "Exchange Act") made in the securities class action entitled *Oklahoma Firefighters Pension and Retirement System v. Peabody Energy Corp., et al.*, Case 1:20-cv-08024 (S.D.N.Y.) ("Securities Class Action").

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of

4

the United States that it would not otherwise have.

16.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

17.     Venue is also proper in the District because the Company is incorporate in Delaware and the Company's By-laws contain an exclusive forum provision:

> Section 5.3. Exclusive Forum. Unless the Corporation consents in writing to the selection of an alternative forum, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director or officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation arising pursuant to any provision of the Delaware General Corporation Law (as it may be amended from time to time) or the Charter or these By-Laws, or (iv) any action asserting a claim against the Corporation or any director or officer or other employee of the Corporation governed by the internal affairs doctrine shall be a state court located within the State of Delaware (or, to the extent that no state court located within the State of Delaware has jurisdiction, **the federal district court for the District of Delaware**). [Emphasis added].

## III.  PARTIES

### A.  Plaintiff

18.     Plaintiff is a current shareholder of Peabody common stock.  Plaintiff has continuously held Peabody common stock at relevant times and is prepared to hold his Peabody stock throughout the duration of this litigation.

### B.  Nominal Defendant Peabody

19.     **Nominal Defendant Peabody** is a Delaware corporation headquartered in St. Louis, Missouri.

### C.  Director Defendants

20.     **Defendant Samantha B. Algaze** ("Algaze") has been a director since 2020. Defendant Algaze is also a member of the Nominating & Corporate Governance Committee.

21.     **Defendant Andrea E. Bertone** ("Bertone") has been a director since 2019. Defendant Bertone is also a member of the Audit Committee and the Health, Safety, Security & Environmental Committee.

22.     **Defendant Nicholas J. Chirekos** ("Chirekos") has been a director since 2017. Defendant Chirekos is also a member of the Audit Committee and the Nominating & Corporate Governance Committee.

23.     **Defendant Stephen E. Gorman** ("Gorman") has been a director since 2017. Defendant Gorman is also a member of the Compensation Committee, the Executive Committee, and is the Chair of the Executive, Health, Safety, Security & Environmental Committee.

24.     **Defendant Glenn L. Kellow** ("Kellow") has been a director since 2015. Defendant Kellow is also a member of the Executive Committee

25.     **Defendant Joe W. Laymon** ("Laymon") has been a director since 2017. Defendant Laymon is the Chair of the Compensation Committee and a member of the Executive, Health, Safety, Security & Environmental Committee.

26.     **Defendant Bob Malone** ("Malone") has been a director since 2009.  Defendant Malone is the Chair of the Executive Committee.

27.     **Defendant David J. Miller** ("Miller") has been a director since 2020.  Defendant Miller is a member of the Executive Committee and Compensation Committee.

28.     **Defendant Michael W. Sutherlin** ("Sutherlin") has been a director since 2014. Defendant Michael Sutherlin is a member of the Compensation Committee, the Executive Committee, and the Chair of the Nominating & Corporate Governance Committee.

29.     ***Defendant Darren R. Yeates*** ("Yeates") has been a director since February 2020. Defendant Yeates is a member of the Audit Committee and the Health, Safety, Security & Environmental Committee.  Yeates has stepped down from his current positions as a member of Audit Committee and the Health, Safety, Security & Environmental Committee of the Board, and will not thereafter serve on any other committees of the Board.

30.     Defendants Algaze, Bertone, Chirekos, Gorman, Kellow, Laymon, Malone, Miller, Sutherlin and Yeates are collectively referred to herein as the "Director Defendants."

**D.     Officer Defendant**

31.     ***Defendant Amy B. Schwetz*** ("Schwetz") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

32.     The Director Defendants and Defendant Schwetz are collectively referred to herein as "Defendants".

**E.     Non-Party Directors**

33.     ***Non-Party Director Bill Champion*** ("Champion") was appointed director in July 2020.

**AUDIT COMMITTEE CHARTER**

34.     According to the Audit Committee Charter, the Audit Committee shall provide "assistance to the Board of Directors in fulfilling its oversight responsibility to the shareholders, potential shareholders, the investment community, and others with respect to (i) the quality and integrity of the Company's financial statements and financial reporting processes, (ii) the Company's systems of internal accounting and financial controls and disclosure controls, (iii) the independent auditor's qualifications and independence, (iv) the performance of the Company's internal audit function and independent auditor, and (v) compliance with legal and regulatory

requirements. In so doing, it is the responsibility of the Committee to maintain free and open communication between the Committee, the independent auditor, the internal auditors and management of the Company."

## PEABODY ENERGY CORPORATION HEALTH, SAFETY, SECURITY AND ENVIRONMENTAL COMMITTEE CHARTER

35.     Health, Safety, Security and Environmental Committee Charter states:

Statement of Responsibilities

The Committee shall have the following oversight responsibilities:

➢ review with management the significant risks or exposures faced by the Company in the health, safety, security and environmental areas, including such liabilities reported in the Company's public reports and financial statements, and steps taken by management to address such risks, including contingency planning and emergency response activities;

➢ review at least annually the Company's health, safety, security and environmental objectives, policies and programs (including processes to ensure compliance with applicable laws and regulations), assessments of the effectiveness of such policies and programs (including periodic performance metrics and audits) and performance;

➢ review methods to communicate the Company's health, safety, security and environmental values and performance to Company employees and the public;

➢ review the Company's efforts to advance the Company's progress on sustainable development (i.e., the integration of social, environmental, and economic principles in the Company's mining operations from exploration through development, operation, reclamation, closure and post closure activities);

➢ review and discuss with management any material noncompliance with health, safety, security and environmental laws, including any pending or threatened administrative, regulatory or judicial proceedings related to such noncompliance, and management's response to such noncompliance;

➢ review and recommend approval of the environmental and mine safety disclosures required to be included in the Company's periodic reports on Forms 10-K and 10-Q;

➢ consider and advise the Board of Directors on health, safety, security and environmental matters and sustainable development, and on the health, safety, security or environmental risks or exposures associated with projects for which management is seeking Board approval;

➢ consider and advise the Compensation Committee on the Company's performance with respect to incentive compensation metrics relating to health, safety, security or environmental matters; and

➢ review and discuss with management significant legislative, regulatory, political and social issues and trends that may affect the health, safety, security and environmental management process and system in place at the Company or the Company's business operations, financial performance or public image, and management's response to such matters.

The Committee shall have the authority to obtain advice and assistance from internal or external legal, accounting and other advisors. In making any such decisions, the Committee should consult with the Chair of the Board or the Lead Independent Director, as applicable. The compensation to be paid to such advisors shall be determined by the Committee or the Chairperson of the Committee, and the Chairperson shall have the authority to bind the Company to pay such compensation and enter into other customary retention arrangements.

The Committee should make regular reports on its activities to the Board of Directors. The Committee may form and delegate authority to subcommittees when appropriate.

The Committee shall (i) review and reassess the adequacy of this charter annually and recommend any proposed changes to the Board of Directors for approval, and (ii) annually review its own performance and report the results of this evaluation to the Board of Directors.

## IV.   **<u>BACKGROUND</u>**

36.    The Company purports to be the largest coal mining company in the world, with operations throughout the United States and Australia.

37.    The Company's coal mines are organized into six business segments, the largest of which is the Australian Metallurgical Mining segment, within which the Company owns and operates seven Australian mines.  In 2016, the Australian Metallurgical Mining segment alone accounted for 23.1% of the Company's revenues.

38.     One such mine within the Australian Metallurgical Mining segment is the North Goonyella mine, which was acquired by the Company in 2004.  The North Goonyella mine is an underground coal mine located in Queensland, Australia.  Coal from this mine is transported to ships at Australian ports for export to customers in India, China, and South Korea.

39.     According to *The Australian Financial Review*, the North Goonyella mine is the Company's "most profitable single operation," and in 2017 it generated approximately $100 million out of the Company's total operating profit of $498 million, equaling approximately 20%. In May 2017, Defendant Kellow stressed the importance of the mine, describing North Goonyella as a "high margin mine" that is the "core of [Peabody's] met coal platform."

40.     In excavating coal from the North Goonyella mine, the Company uses a method called longwall mining.  This method uses heavy machines underground to cut large panels of coal, frequently up to 1,500 feet wide and two miles long.  Longwall mining often causes methane and other dangerous, flammable gases to linger underground, high concentrations of which often occur when production rates are high and longwall mining equipment is repositioned within the mine.  This leaves the mine prone to spontaneous combustion events when the high concentrations of flammable gases come into contact with a heat source.  As a result, it is imperative that mines using the longwall mining method implement adequate safety measures to protect against these risks, including, among others, ventilation systems, methane drainage methods, gas monitoring controls, and airtight seals.

41.     For this reason, the Company's Board of Directors (the "Board") has a "Health, Safety, Security, and Environmental Committee" (the "Safety Committee") that is responsible for reviewing significant mine safety risks, policies, and performance with Company management.  In 2017, 2018, and 2019, the Safety Committee held 8, 9, and 6 meetings, respectively.

42.     On April 13, 2016, after a multi-year decline in coal prices that strained the Company's ability to service its $8.8 billion debt load, the Company filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, and the Company's stock was delisted from the NYSE.  A year later, on April 3, 2017, Peabody announced that it had emerged from bankruptcy and that its stock would begin trading again on the NYSE.

43.     Following its emergence from bankruptcy, the Company was faced with a fragile economic situation including a high debt load, and thus was motivated to produce high amounts of coal while cutting safety costs in order to boost the Company's profit.

## V.     FALSE AND MISLEADING STATEMENTS

44.     At the beginning of the Relevant Period, the North Goonyella mine reported record production output. While Defendants touted these results, they misled the market about the sustainability of North Goonyella's coal production by failing to disclose that the Company's inadequate safety measures had put the mine at a heightened risk of complete shutdown.

45.     On April 3, 2017, the Company announced that it had emerged from bankruptcy protection and that its stock would begin trading again on the NYSE under the ticker symbol "BTU."  In conjunction with that announcement, the Company also reported that: "In the past year, the Company has reduced debt by more than $5 billion from pre-filing levels at March 2016.  In addition, the Company achieved record safety this past year; protected jobs; served global customers; reduced costs and built cash and liquidity; strengthened the Australia platform; accelerated coal mine restoration; provided third-party bonding assurances; and was recognized globally for sustainability."

46.     On May 4, 2017, the Company reported positive financial results for its first quarter 2017.  The Company reported that its revenue had increased 29 percent to $1.33 billion

11

over the first quarter 2016, and that its net income increased $287.2 million to $122.1 million, the highest net income in nearly five years.  The Company also reported that its adjusted EBITDA increased $304.9 million to $390.0 million.

47.     Defendant Kellow was quoted in the first quarter 2017 earnings release stating that following the Company's emergence from bankruptcy: "The emerged Peabody is proceeding with a new balance sheet, improved industry fundamentals and a sharp focus on creating value.  […] This focus begins with an emphasis on safe and productive operations that are constantly working to move down the cost curve; carries forward with intense management of both the asset and liability side of our balance sheet; and extends to our financial strategies that are aimed at prioritizing higher returns for shareholders."

48.     On the same date, the Company hosted a conference call with analysts and the market to discuss its results.  Defendant Kellow reiterated the Company's continued focus on safety at its mines: "I would in closing like to extend my appreciation to our employees around the world for their ongoing commitment to ensuring safe, productive operations and continued delivery of value."

49.     In response to an analyst's question, Defendant Kellow stressed the importance of the North Goonyella mine to the Company's overall financial wellbeing: "I think the high return is probably the key there.  And I've said we'd regard the coal or the met coal platform as being those high-margin mines in Coppabella on PCI and North Goonyella on hard coking coal.  So, I think the capital allocations and capital priorities and the ability to expand, I think our focus would first and foremost be around those mines with respect to capital."  He also stressed that those two mines are "what we believe two high quality, high margin mines in North Goonyella and Coppabella."

50.     On July 10, 2017, the Company filed its 2016 Form 10-K/A with the SEC.  The 2016 10-K/A contained a section entitled "Risk Factors." Among those provided, the Company included the following potential risk warning: "Risks inherent to mining could increase the cost of operating our business."  Under the heading, the Company stated: "Our mining operations are subject to conditions that can impact the safety of our workforce, or delay coal deliveries or increase the cost of mining at particular mines for varying lengths of time.  These conditions include . . . fires and explosions from methane gas or goal dust."  The Company continued: "Despite our efforts, such conditions could occur and have a substantial impact on our results of operations, financial condition or cash flows."  This disclosure regarding the risk of fire and explosion from methane gas, was repeated in the 1Q 2017 10-Q, 2Q 2017 10-Q, 3Q 2017 10-Q, 1Q 2018 10-Q, 2Q 2018 10-Q and the 2017 10-K.

51.     On August 1, 2017, the Company reported positive financial results for the second quarter 2017.  The Company reported that its revenues had increased 21 percent to $1.26 billion from $1.04 billion and that its adjusted EBITDA increased $245.2 million from the same period in the prior year to $317.9 million, led by the Australian platform, which outpaced U.S. contributions and contributed an additional $181.6 million over the prior year.

52.     On August 1, 2017, the Company hosted a conference call with analysts and the market to discuss its results, where Defendant Kellow stated that "[o]perationally, the second quarter marked the best six months of production over the past five years at the North Goonyella mine."  Then, Defendant Kellow stressed the Company's continued focus on safety at its mines, reporting that he "would like to extend my appreciation to all our employees both at the mines and in offices for their continued commitment to ensuring safe and productive environments."

53.     On October 25, 2017, the Company reported positive financial results for the third

quarter 2017.  The Company reported that its revenues had increased 22 percent to $1.48 billion and that its adjusted EBITDA increased $281.1 million from the prior year to $411.3 million.  The press release quoted Defendant Schwetz: "Peabody continues to take aggressive actions to reduce debt and advance the shareholder return initiatives we outlined in August."

54.     On October 25, 2017, the Company hosted a conference call with analysts and the market to discuss its results, where Defendant Kellow claimed: "Through all of our actions, Peabody maintains constant vigilance toward safety."

55.     On February 7, 2018, the Company reported positive financial results for the fourth quarter and full year 2017.  The Company reported that revenues for the fourth quarter increased percent over the prior year to $1.52 billion and full year 2017 revenues increased 18 percent over the prior year to $5.58 billion, driven by, among other things, higher Australian metallurgical and thermal coal pricing.  The Company further reported that fourth quarter adjusted EBITDA increased $122.2 million over the prior year to $416.2 million.

56.     On February 7, 2018, the Company hosted a conference call with analysts and the market to discuss the Company's results, where Defendant Kellow stated: "At the operational level, our global safety performance continues to surpass industry averages.  While our incidence rate edged up overall from the prior year, our Australian platform had a record year, improving 17% from 2016.  As always, we are ever vigilant on our journey of continuous improvement in safety."  He also stated: "As always, we begin with a focus on safe productive operations and return maximization."

57.     On February 22, 2018, during the Company's Analyst and Investor Day, the Company represented that at the North Goonyella coal mine: "Record safety results reflect 80% improvement since 2013."

58.     On April 25, 2018, the Company again reported positive financial results for the first quarter 2018.  The Company reported that revenues for the first quarter rose 10 percent over the prior year to $1.46 billion and that adjusted EBITDA increased 7 percent over the prior year to $363.0 million.

59.     On April 25, 2018, the Company hosted a conference call with analysts and the market to discuss the Company's results, where Defendant Kellow stressed the Company's "ongoing focus on safe productive work places."

60.     In or around May 2018, the Company published its 2017 Corporate and Social Responsibility Report, which stated that the Company "commit[s] to safety and health as a way of life" and that "Safety is Peabody's first value, integrated into all areas of our business."  The report further stated that: "A focus on improving culture and doing business better lifted the North Goonyella Underground Mine to new records for performance in safety, production and development in 2017."   The report also discussed a Company initiative called "Project Excellence," which "is Peabody Australia's cost and productivity improvement plan that has driven initiatives critical to the platform's sustainability without compromising safety, achieving 2017 savings of about $130 million.  The platform boasted its best-ever safety performance and reclaimed more than 1,200 acres of land."

61.     The report included a letter from Defendant Kellow: "Peabody's global safety performance continues to surpass industry averages.  The Australian platform achieved a record safety year in 2017, and we remain ever vigilant on our journey of continuous improvement in safety."

62.     On July 24, 2018, the Company reported positive financial results for the second quarter 2018.  The Company reported that revenues for the second quarter increased 4 percent over

the prior year to $1.31 billion, and that adjusted EBITDA increased $51.8 million over the prior year to $369.6 million.

63.     On July 24, 2018, the Company hosted a conference call with analysts and the market to discuss the Company's results, where Defendant Kellow once again emphasized the Company and its employees' "continued focus on safe and productive workplaces."

64.     In August 2018, in an Investor Presentation, the Company reported that its "[s]afety performance continues to outperform industry averages," and that it paid "[s]trong attention to operational excellence by committing to safe workplaces, maximizing resource recovery, improving environmental performance and restoring mined lands."

65.     On September 18, 2018, after the Company had continuously touted its safety record at North Goonyella for over a year, *The Australian Financial Review* reported that work had been suspended at the mine due to elevated methane and carbon monoxide levels.  According to the report, "multiple sources have indicated that the coal is generating excessive levels of heat, that this is the source of the gas accumulation and that management is uncertain why or where this unanticipated burst of heat is coming from."  The report further explained that "[t]hose same sources estimate that mine management has no more than two weeks to solve both issues because a half-moved longwall 'cannot just sit down there for too long without moving.'"

66.     The Company downplayed these concerns: "About 2 ½ weeks ago, an area of the North Goonyella mine began registering higher gas levels, suggesting modest elevated temperatures and low-level oxidation of some coal."  However, the Company also stated that "[m]ine management quickly assessed the facts [and] took appropriate steps," and further reassured investors that 2018 coal production volumes would not be impacted by these operational issues, noting that "the company had been trending to the upper end of its 2018 metallurgical coal

sales volume targets, and those targets have not been revised."

67.     On September 19, 2018, the Company issued Form 8-K reporting that "the [C]ompany is working toward resuming operations."

68.     On September 25, 2018, the Company issued another Form 8-K, downplaying the significance of the issues at the North Goonyella mine and the imminent risk of spontaneous combustion at the mine, reporting that "gas levels at its North Goonyella Mine have been variable and remain elevated.  The company is working with the Queensland Mines Inspectorate ("QMI") and third-party experts as we continue a progressive plan aimed at reducing gas levels and accommodating a safe return to mining operations."

69.     The statements referenced in ¶¶ 43-67 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the safety practices at the Company's North Goonyella mine:

        (a)     The Company had failed to implement adequate safety controls at the North Goonyella mine to prevent the risk of a spontaneous combustion event;

        (b)     The Company failed to follow its own safety procedures; and

        (c)     As a result, the North Goonyella mine was at a heightened risk of shutdown.

70.     Despite these attempts to downplay the operational issues at the North Goonyella mine, on September 28, 2018, the Company issued a press release reporting that a fire was occurring within the mine and that as a result, it did "not expect any production from North Goonyella in the fourth quarter of 2018."  On this news, the Company's stock fell $5.54, or 13.5 percent, closing at $35.64 on September 28, 2018, down from the previous day's close of $41.18.

71.     An article by *The Daily Mercury* published on September 28, 2018 quoted a long-time underground operator at the North Goonyella mine as stating that employees had been told

17

not to talk about the incident: "We're told 'don't talk to the media, don't talk to the media' but I think people have a right to know."

72.     In an investor update on October 2, 2018, the Company stated that the fire was mostly contained and that the Company would initiate a formal review of the fire with the involvement of independent third parties.  On October 11, 2018, the Company further disclosed that the QMI would commence a safety investigation into the Company related to the events leading up to the North Goonyella fire.

73.     However, even after the fire and the announcement of both an internal and a governmental investigation, the Company continued to mislead the market about its plan to restart operations at North Goonyella, falsely assuring the market that the Company would be able to mine significant coal at the North Goonyella mine in the near-term, while continuing to conceal major issues that would impede any progress at the mine and which would ultimately cause QMI to reject its plans.  Specifically, the statements conditioned the market to believe that its low-cost plan to restart operations at North Goonyella was reasonable and had a high likelihood of regulatory approval, while simultaneously omitting to disclose that the plan posed unreasonable safety and environmental risks such that QMI would likely mandate a safer, more cost-prohibitive approach that would cause major delays in restarting the mine.

74.     On October 30, 2018, the Company hosted a conference call with analysts and the market to discuss the Company's third quarter 2018 financial results, where Defendant Kellow convinced investors that the Company would in fact be able to restart operations at North Goonyella.  Defendant Kellow stated: "based on the market reaction, it would seem that the market contemplates an entire loss of North Goonyella. While we very much understand the concern, based on what we know today, that conclusion is at best premature and at worst unwarranted."

Defendant Kellow also informed the market that production in North Goonyella may restart in the second half of 2019.  Defendant Schwetz also stated: "The company will take all steps to work safely, progress the plan and look to mitigate costs, while pursuing options for a resumption of activities at the appropriate time."  On this news, the Company's stock price increased by 3.4 percent.

75.    Analysts equated Defendants' reassurances regarding North Goonyella to the rising stock value, with J.P. Morgan reporting on October 30, 2018 that "[t]he market has warmed to Peabody's recovery plan for North Goonyella with the stock rising 4.7% compared with the S&P's +0.85 so far today.  As CEO Kellow suggested some investors seem to believe the mine was lost to a fire, and Peabody's plan shows that closure is neither the company's #1 or #2 scenario."

76.    However, on February 6, 2019, the Company reported disappointing earnings for the fourth quarter 2018, weak Q4 2018 coal production, and a soft 2019 outlook due to remediation costs and lack of production at the North Goonyella mine.  At the same time, Defendant Kellow revealed that production at the North Goonyella mine would not resume in 2019 but was instead now targeted to "begin to ramp up in the early months of 2020."  On this news, the Company's stock fell $3.80, or 10.6 percent, closing at $32.05 on February 6, 2019, down from the previous day's close of $35.85.

77.    However, Defendant Kellow continued to mislead the market regarding the likelihood that production at the mine would restart in the near-term, reporting that: "While there is so much work ahead of us, our base case contemplates approximately 2 million tons of sales from North Goonyella in 2020."

78.    On March 27, 2019, the Company issued a press release entitled "Peabody

Releases Initial Learnings From North Goonyella Incident."  In that press release, the Company concluded that the fire resulted from a planned longwall move and further admitted that its safety precautions were insufficient, reporting that, as a result of the fire, the Company was "making changes in systems, processes and training, where warranted, to put into place the improvements needed to successfully move forward from this incident."  These changes included improvements to ventilation controls, gas level monitoring, longwall relocation processes, and underground sealing methods.

79.     On May 1, 2019, the Company issued a Form 8-K reporting positive first quarter 2019 earnings that met analysts' estimates.  At the same time, however, the Company reported that it was "currently complying with a directive concerning documentation from the Queensland Mines Inspectorate, following a thorough review, which has resulted in a multi-week delay to the initial project plan."  The Company went on that "[i]f further delays occur, the company will re-evaluate its reventilation and re-entry plans, including longwall production targets, quarterly project costs and capital expenditures."  On this news, the Company's stock fell $1.61, or 5.6 percent, closing at $27.16 on May 1, 2019, down from the previous day's close of $28.77.

80.     Yet the Company continued to mislead the market regarding the possibility of regulatory approval from QMI and the timeline for restarting the North Goonyella mine.  In connection with the release of its first quarter 2019 financial results, the Company hosted a conference call with analysts and the market, where Defendant Kellow stated: "Our focus at this point is working through that process, responding to their requests for information and then being able to – as I said, everything's ready to flick the switch and to be out to re-ventilate and that will enable this thing to monitor and then re-enter the mine and have a better assessment."  He further reported: "At that point we look to re-examine the overall timing and sequencing on the project

plan, but just to reiterate, we're ready to go, so we're just working through that, what is a final part of the process . . .  It's dotting the I's and crossing the T's around supporting documentation with respect to chisel-out procedures and protocols that are on the wrong side."  Defendant Schwetz reiterated this point: "Related to North Goonyella, in the first quarter, we completed segmenting of the mine into multiple zones to facilitate a phased reventilation and reentry. In addition, all physical activities in advance of reventilating the first segment of the mine have been completed."

81.     Analysts believed Defendants' statements.  On May 1, 2020, J.P. Morgan reported that: "The company also reported that it is ready to re-enter the first portion of the North Goonyella mine but has been delayed as the Queensland Mine regulator reviews documents."  Deutsche Bank reported on the same date that "North Goonyella undergoing multi-week delay due to Queensland Mines Inspectorate review, but guide of 2m st of production of 2020 remains unchanged."

82.     On July 31, 2019, the Company issued a Form 8-K again reporting positive earnings for the second quarter 2019.  However, the Company reported additional delays to the reentry into North Goonyella due to QMI: "Advancement during the recovery phase has been subject to the discretion of the regulatory authority, special protocols and substantial related administrative requirements, which has resulted in a far slower rate of progress than originally contemplated."  As a result, the Company suspended its 2020 production guidance at the mine and informed investors that it was reevaluating its entire reentry plan. Defendant Kellow also announced that the Company had hired an outside firm to evaluate its organizational structure.  On this news, the Company's stock fell $1.06, or 4.8 percent, closing at $21.06 on July 31, 2019, down from the previous day's close of $22.12.

83.     Analysts connected this stock drop to the news about North Goonyella, with J.P. Morgan reporting on July 31, 2019 that "we expect the North Goonyella news will dominate and

depress the market's reaction to [other positive Company news]," and, later that day confirming, "[t]he market did not react well to Peabody's announcement of delays at North Goonyella."

84.     However, on the same date, the Company hosted a conference call with investors and analysts to discuss its second quarter 2019 financial results, where Defendant Kellow touted the Company's progress in reentering the mine: "Turning to North Goonyella, major progress has been made to-date including reventilation and re-entry of the mine. We've also learned a substantial amount since we commenced activities underground earlier this month."

85.     Analysts accepted this story, with Deutsche Bank noting on August 4, 2019 that "Key catalysts for the stock include . . . progress at North Goonyella where we expect the market has now rebased down, so any announcements could be positive."

86.     On August 9, 2019, QMI released a one-page document with its preliminary investigative findings indicating that the Company had deficient safety systems at North Goonyella and that the Company was not cooperating fully with its investigation.  Specifically, QMI noted that all Peabody employees chose not to be interviewed by the agency.  Among other things, the following observations were included in the report:

(a)     Review of the mine's records suggests that gas trends were not given sufficient consideration, which may have impacted the way in which [trigger action response plans] were applied and actioned;

(b)     Some key reports relating to the mine's ventilation plan, gas alarm system and explosion risk zone controls do not appear to have been reviewed or countersigned by key personnel, as required under the mine's safety and health management system;

(c)     There is evidence that some boreholes located deep within the 9N goaf region were insufficiently sealed, allowing an ingress of oxygen into active goaves, with the potential to escalate conditions for spontaneous combustion; and

(d)     There is evidence to suggest the mine did not follow its own procedures relating to major ventilation changes.

87.     On this news, Peabody's stock fell $0.37, or 2 percent, closing at $18.13 on August 9, 2019, down from the previous day's close of $18.50.

## TRUTH EMERGES

88.     On October 29, 2019, the Company issued a Form 8-K reporting a third quarter 2019 loss of $0.88 per share, as compared with positive third quarter 2018 earnings of $0.63 per share, missing analysts' consensus expectations by more than 50 percent.  At the same time, Peabody disclosed for the first time that QMI's strict restrictions on restarting operations at the North Goonyella mine would result in a three or more year delay before any meaningful coal could be produced.

89.     During the subsequent earnings call, Defendant Kellow elaborated on this revelation: "Overall, we believe the highly restrictive approach from QMI has required a greatly disciplined approach from Peabody.  As such, we have identified a preferred path, which . . . represent[s] significant lower risk, the best path to return the regular way mining and maximizes the value of a mine with a potential life of several decades."  Defendant Kellow explained that even the beginning steps of that new plan were still "contingent on obtaining pre-approval from QMI."

90.     On this news, the Company's stock fell $3.56, or 22 percent, closing at $12.48 October 29, 2019, down from the previous day's close of $16.04.

23

## VI.    FIDUCIARY DUTIES OF DEFENDANTS

91.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

92.     Each director and officer of the Company owes to Peabody and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

93.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

94.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

95.     Defendants, by virtue of their positions as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for

their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of Defendants who were also officers and directors of the Company has been ratified by the remaining Defendants who collectively comprised the Board at all relevant times.

96.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

97.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Peabody conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Peabody and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Peabody' operations would comply with all applicable laws and Peabody' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

98.     Each of the Defendants further owed to Peabody and the shareholders the duty of loyalty requiring that each Defendant favor Peabody' interest and that of its shareholders over his

or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

99.     At all times relevant hereto, Defendants were the agents of other and of Peabody and were at all times acting within the course and scope of such agency.

100.     Because of their advisory, executive, managerial, and directorial positions with Peabody, each of the Defendants had access to adverse, non-public information about the Company.

101.     Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Peabody.

## VII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

102.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  Defendants caused the Company to conceal the true facts as alleged herein.  Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

103.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

104.     Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set

forth herein.  Because the actions described herein occurred under the authority of the Board, each Defendant, who are directors of Peabody, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

105.    Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

106.    At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Peabody and was at all times acting within the course and scope of such agency.

## VIII.   DAMAGES TO THE COMPANY

107.    As a direct and proximate result of Defendants' conduct, the Company has lost and expended, and will lose and expend, many millions of dollars.

108.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

109.    As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## IX.    DERIVATIVE ALLEGATIONS

110.    Plaintiff brings this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of the Company, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting thereof.

111.    The Company is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

## X.    DEMAND FUTILITY ALLEGATIONS

112.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

113.    A pre-suit demand on the Board of the Company is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven (11) individuals: Defendants Algaze, Bertone, Chirekos, Gorman, Kellow, Laymon, Malone, Miller, Sutherlin, Yeates (the "Director-Defendants") and non-party Champion.  Plaintiff needs only to allege demand futility as to six of these eleven Directors.

114.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material.

115.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of

liability, are not disinterested, and demand upon them is futile, and thus excused.

**Defendant Kellow**

116.    Defendant Kellow is also incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

117.    Defendant Kellow, the Company's CEO, is also not an independent director. Defendant Davis is not disinterested for purposes of demand futility because his principal occupation is CEO of the Company.

**Defendant Yeates**

118.    Defendant Yeates, the Company's Executive Vice President and Chief Operating Officer, is not an independent director.  Defendant Yeates is not disinterested for purposes of demand futility because his principal occupation is Executive Vice President and Chief Operating Officer of the Company.

**Defendants Bertone, Chirekos, and Sutherlin**

119.    Defendants Bertone, Chirekos, and Sutherlin served on the Company's Audit Committee during the Relevant Period.  Pursuant to the Company's Audit Committee Charter, the Audit Committee members were responsible for overseeing the Company's financial reporting process, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting.  The Audit Committee failed to ensure the integrity of the Company's financial statements, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls.  Therefore, these Defendants (as members of the Audit Committee) breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendants Bertone, Gorman, Laymon and Yeates**

120.     Defendants Bertone, Gorman, Laymon and Yeates served on the Company's Health, Safety, Security & Environmental Committee during the Relevant Period.  Pursuant to this Committee's Charter, these Defendants were responsible for:

> ➤      review with management the significant risks or exposures faced by the Company in the health, safety, security and environmental areas, including such liabilities reported in the Company's public reports and financial statements, and steps taken by management to address such risks, including contingency planning and emergency response activities;

> ➤      review at least annually the Company's health, safety, security and environmental objectives, policies and programs (including processes to ensure compliance with applicable laws and regulations), assessments of the effectiveness of such policies and programs (including periodic performance metrics and audits) and performance;

> ➤      review methods to communicate the Company's health, safety, security and environmental values and performance to Company employees and the public;

> ➤      review the Company's efforts to advance the Company's progress on sustainable development (i.e., the integration of social, environmental, and economic principles in the Company's mining operations from exploration through development, operation, reclamation, closure and post closure activities);

> ➤      review and discuss with management any material noncompliance with health, safety, security and environmental laws, including any pending or threatened administrative, regulatory or judicial proceedings related to such noncompliance, and management's response to such noncompliance;

> ➤      review and recommend approval of the environmental and mine safety disclosures required to be included in the Company's periodic reports on Forms 10-K and 10-Q;

> ➤      consider and advise the Board of Directors on health, safety, security and environmental matters and sustainable development, and on the health, safety, security or environmental risks or exposures associated with projects for which management is seeking Board approval;

> ➤      consider and advise the Compensation Committee on the Company's performance with respect to incentive compensation metrics relating to health, safety, security or environmental matters; and

31

> ➢ review and discuss with management significant legislative, regulatory, political and social issues and trends that may affect the health, safety, security and environmental management process and system in place at the Company or the Company's business operations, financial performance or public image, and management's response to such matters.

121. Therefore, these Defendants (as members of the Health, Safety, Security & Environmental Committee) breached their fiduciary duties, are not disinterested, and demand is excused as to them.

122. Moreover, as member of the Health, Safety, Security & Environmental Committee, Defendants Bertone, Gorman, Laymon and Yeates knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Bertone, Gorman, Laymon and Yeates face a substantial likelihood of liability. If Defendants Bertone, Gorman, Laymon and Yeates were to bring a suit on behalf of Peabody to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason demand is futile as to Defendants Bertone, Gorman, Laymon and Yeates.

**Defendants Miller and Algaze**

123. Defendant Miller is an Equity Partner and Senior Portfolio Manager and Head of U.S. Restructuring for Elliott Management.

124. Defendant Algaze is a Portfolio Manager at Elliott Management.

125. Defendants Miller and Algaze would not consider filing suit against one another

because they both work for the same company.  Further, Defendant Algaze would not consider filing suit against Defendant Miller because Defendant Miller is an Equity Partner at Elliott Management and has the power to terminate Defendant Algaze's employment with Elliott Management.  Thus, demand is futile as to Defendants Miller and Algaze.

## XI.   CAUSES OF ACTION

### COUNT I

### (Against Defendant Kellow and Schwetz for Contribution Under Sections 10(b) and 21D of the Exchange Act)

126.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127.    The Company, along with Defendants Kellow and Schwetz, is named as a defendant in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendants Kellow and Schwetz's willful and/or reckless violations of his obligations as an officer and directors of the Company.

128.    Through their positions of control and authority as officers of the Company, Defendants Kellow and Schwetz was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Actions and herein.

129.    As such, Defendant Kellow and Schwetz are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising

out of violations of the Exchange Act.

## COUNT II

### (Against Defendants for Breach of Fiduciary Duties)

130.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.     Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Peabody' business and affairs.

132.     Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

133.     Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Peabody.

134.     Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

135.     In further breach of their fiduciary duties, Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

136.     Plaintiff, on behalf of Peabody, has no adequate remedy at law.

## COUNT III

### (Against Defendants for Waste of Corporate Assets)

137.     Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

138.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Peabody to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.  As a result of the waste of corporate assets, Defendants are each liable to the Company.

139.   Plaintiff, on behalf of Peabody, has no adequate remedy at law.

### COUNT IV

### (Against Defendants for Unjust Enrichment)

140.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141.   During the Relevant Period, Defendants received bonuses, stock options, and/or similar such compensation from Peabody that were tied to the financial performance of the Company.  Defendants were unjustly enriched thereby

142.   To remedy Defendants' unjust enrichment, this Court should order Defendants to disgorge their unjustly obtained bonuses and compensation.

## XII.   REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to

protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XIII.  <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 22, 2020

**O'KELLY & ERNST, LLC**

<u>/s/ Ryan M. Ernst</u>

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

Ryan M. Ernst (#4788)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
Telephone: (302) 778-4000
Email: rernst@oelegal.com

*Attorneys for Plaintiffs*

*Attorneys for Plaintiffs*